1  KEKER, VAN NEST & PETERS LLP
   RACHAEL E. MENY - # 178514
2  rmeny@keker.com
   R. JAMES SLAUGHTER - # 192813
3  rslaughter@keker.com
   IAN A. KANIG - # 295623
4  ikanig@keker.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7  Attorneys for Plaintiff
   LYFT, INC.

8

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYFT, INC., a Delaware corporation, | Case No. 3:18-cv-6978 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES** |
| v. | **DEMAND FOR JURY TRIAL** |
| WARREN POSTMAN, an individual citizen of Virginia, and KELLER LENKNER LLC, an Illinois limited liability corporation, | **PRELIMINARY INJUNCTION MOTION FILED CONCURRENTLY HEREWITH** |
| Defendants. | Date Filed:  November 16, 2018 |
| | Trial Date:  None Set |

## INTRODUCTION

1.      The attorney-client privilege is a bedrock of American law.  It is the fundamental safeguard that allows attorneys to communicate confidentially with their clients.  In California, the common-interest doctrine enshrines a critical application of the attorney-client privilege.  It allows attorneys for one client to collaborate with attorneys for another client in joint-defense groups and in affirmative litigation against a shared adversary.  Without the common interest doctrine, an ally's attorney could walk in the front door of your attorney's office promising confidential collaboration, acquire your attorney's core work on your case, and then walk out the door and sue you using that information.  Obviously, that would constitute an unacceptable breach of confidence warranting condemnation.

2.      Plaintiff Lyft, Inc. ("Lyft") brings this lawsuit against Defendant Warren Postman and his law firm, Defendant Keller Lenkner LLC (together, "Defendants") for doing exactly that. Postman, a senior attorney for the Litigation Center for the United States Chamber of Commerce, worked hand in hand with senior members of Lyft's in-house legal team from December 2015 to June 2018 on a variety of common-interest legal issues between Lyft and the Chamber, including two lawsuits against the City of Seattle that the Chamber filed in coordination and collaboration with Lyft.[1]

3.      Starting in 2015, the City of Seattle tried to enact a collective bargaining ordinance that provided independent contractor, "for-hire" drivers (like those operating on the Lyft Platform) the right to collectively negotiate their contracts through "driver coordinators."  Other states, including California and Massachusetts, were considering similar measures at that time.

4.      The Chamber decided to challenge the Seattle ordinance on the ground that it would violate federal antitrust and labor law.   A key issue in the litigation was whether Lyft drivers were properly classified as independent contractors and the Chamber sought Lyft's help in understanding the facts regarding driver classification on the Lyft platform and the contours of Lyft's confidential legal strategy on such issues.  The Chamber also solicited Lyft's assistance

---

[1] The lawsuits that Lyft and the Chamber collaborated on against the City of Seattle are on PACER as: (1) *Chamber of Commerce v. City of Seattle*, No. 2:16-cv-00322 (W.D. Wash. 2016); and (2) *Chamber of Commerce v. City of Seattle*, No. 2:17-cv-00370 (W.D. Wash. 2017).

regarding how the ordinance would have harmed Lyft's operations in Seattle, facts that would provide the Chamber with associational standing in the lawsuit.  Lyft agreed to partner with the Chamber on such issues so long as the Chamber never used or disclosed Lyft's privileged and confidential information without authorization.  The Chamber agreed.

5.      The resulting common-interest relationship between Lyft and the Chamber was not a dalliance.  In innumerable calls, meetings and emails, Postman repeatedly promised confidentiality to Lyft and acquired privileged and confidential information about Lyft's business operations and its attorneys' core work product on classification issues related to drivers on the Lyft Platform.  In fact, when the California Supreme Court signaled that it was about to change classification law in California (and later did so), Postman was there to discuss the issue with Lyft's legal team.

6.      Lyft needed to share this information with Postman because each of the claims that the Chamber raised in its lawsuits against the City of Seattle relied on the supposition that drivers on the Lyft Platform were properly classified as independent contractors.  In other words, if drivers on the Lyft platform should instead have been classified as employees, the Chamber's claims would necessarily fail.

7.      Postman was only able to acquire this information by repeatedly promising Lyft's legal team that he and other attorneys for the Chamber would maintain Lyft's information in the utmost confidence and would never use or disclose the communications they exchanged.  Additionally, during one important visit to Lyft's headquarters in January 2017, Postman signed a non-disclosure agreement with Lyft that also prevents him from using Lyft's confidential information.

8.      Postman did not live up to his promise.  In June 2018, Postman quit the Chamber to join his friends' new plaintiff's firm, Keller Lenkner.  Shortly thereafter, and despite having obtained confidential information on such issues from Lyft for several years, Postman and Keller Lenkner apparently began pursuing driver misclassification claims against Lyft with respect to drivers in California and Massachusetts.  The City of Seattle litigation and the *Dynamex*-related legal discussions are substantially related to the driver misclassification actions now being

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES
Case No. 3:18-cv-6978
1303840

asserted by Defendants against Lyft because, among other reasons, they each involve questions of whether Lyft drivers are properly classified as independent contractors.  Indeed, in order for Defendant Postman and the Chamber to litigate the City of Seattle litigation, they needed to understand Lyft's classification practices and legal theories.

9.      Postman must now be held liable to Lyft for his conduct.  California law presumes a duty of confidence between persons who convey confidential information with the understanding that they are operating in a confidential relationship.  Lyft and Postman, in their common-interest work together, both understood that the information they shared with one another was privileged and confidential.  By using and disclosing Lyft's privileged and confidential information to file driver-misclassification claims against Lyft, Postman is in clear breach of his duty of confidence.

10.     This outrageous breach of confidence warrants immediate relief.  California and federal law uniformly agree that the harm caused by the disruption of the attorney-client privilege is irreparable.

11.     The only way to preserve the confidential nature of Lyft's attorney-client privilege communications and information shared with Postman under the common interest agreement is to disqualify Defendants from litigating misclassification-related lawsuits against Lyft.  Under basic conflict of interest rules in California, an attorney **must** be disqualified if he or she **either** (1) possesses confidential information about a non-client from a prior representation (*e.g.*, from a joint-defense group or common-interest relationship); **or** (2) there is a substantial relationship between the two matters (in which case access to confidential information is presumed).  Postman is disqualified from representing anyone, including drivers on the Lyft Platform, who raise misclassification-related litigation against Lyft under either standard.  Postman possesses privileged and confidential information about Lyft from his prior representation of the Chamber *and* the two matters are far more than substantially related.  This conflict of interest is imputed to Keller Lenkner.

12.     Keller Lenkner is also vicariously liable for Postman's conduct under the doctrine of civil conspiracy because it knew and agreed to use and disclose Lyft's privileged and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES
Case No. 3:18-cv-6978

confidential information, despite their knowledge that Postman had a duty of confidence to Lyft. Indeed, Lyft's outside counsel put Keller Lenkner on notice of Postman's conflict before they filed driver-misclassification claims against Lyft, but Defendants filed the claims anyway.

13.     Accordingly, Lyft seeks: (a) a preliminary and permanent injunction disqualifying Defendants from representing anyone against Lyft on misclassification-related issues; (b) a declaration of its rights with respect to Lyft's confidential relationship with Postman and whether that confidential relationship precludes Defendants from representing any person against Lyft on misclassification-related issues; and (c) compensatory damages, punitive damages, and consequential damages in an amount well-exceeding $75,000.

14.     Given the irreparable nature of the harm that Lyft would incur if Defendants were allowed to use its privileged and confidential information in an adversarial proceeding, Lyft has filed a preliminary injunction motion concurrently with this complaint to expedite the action.

## JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and there is more than $75,000 in controversy and has further remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

16.     Venue properly lies within this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District. Among other things, and as described in detail below, Lyft's principal place of business is in the District, Defendant Postman travelled to the District to meet with Lyft, emailed and called Lyft in the District, and executed his non-disclosure agreement with Lyft in the District, and Defendants submitted their conflicted arbitration demands against Lyft in the District.

## INTRADISTRICT ASSIGNMENT

17.     Pursuant to Civil Local Rule 3-5, this case should be assigned to the San Francisco or Oakland Division of this Court because the action arises in San Francisco County.

## PARTIES

18.     Plaintiff Lyft, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Lyft maintains a smartphone-based application that connects people

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES
Case No. 3:18-cv-6978
1303840

looking to get from one place to another with people willing to provide those rides. That is the Lyft Platform.

19.     Defendant Warren Postman is a citizen of Virginia, where he is domiciled, and an attorney licensed to practice in Washington D.C. He is currently a partner at Defendant Keller Lenkner LLC. Before joining Defendant Keller Lenkner LLC, he worked as attorney for the Chamber, which is also based in Washington, D.C.

20.     Defendant Keller Lenkner LLC is an Illinois limited liability corporation, with its principal place of business at 150 North Riverside Plaza, Suite 4270, Chicago, Illinois 60606. It is a plaintiff-side law firm founded in January 2018. On information and belief, Defendant Keller Lenkner LLC maintains a satellite office in Washington, D.C. where Defendant Postman works.

## STATEMENT OF FACTS

**A.     Until June 8, 2018, Defendant Postman was an attorney for the U.S. Chamber of Commerce's in-house legal team at the U.S. Chamber Litigation Center.**

21.     Lyft is a member of the U.S. Chamber of Commerce, a non-profit organization whose mission is to benefit the business community. The U.S. Chamber of Commerce's members are United States business associations.

22.     The U.S. Chamber Litigation Center is a non-profit affiliate of the U.S. Chamber of Commerce that functions as the in-house litigation team for the U.S. Chamber of Commerce and its other affiliates. The U.S. Chamber Litigation Center is responsible for filing affirmative litigation and amicus curiae briefs on behalf of the U.S. Chamber of Commerce and its members at the federal and state level.

23.     The Chamber regularly litigates disputes on, among other things, labor and employment, class action and arbitration, antitrust, and consumer protection law in cases that raise issues of concern to the nation's business community in general or to particular industries, including Chamber members such as Lyft.

24.     When the Chamber brings affirmative litigation, it often relies on the associational standing derived from injuries incurred (or to be incurred) by its members. To develop the Chamber's associational standing arguments, the Chamber frequently relies on its members, like

Lyft, to provide confidential information about how federal and state statutes, regulations, and decisional law impact their business operations. The Chamber also relies on members, like Lyft, to work cooperatively with it on litigation issues, including to determine legal strategies for the Chamber's affirmative litigation.

25.     To preserve the attorney-client privilege during affirmative litigation and other legal matters, the Chamber and a party with common interests often will mutually agree to share confidential communications relating to prospective or ongoing litigation for their mutual common interest. The Chamber and the party in those instances intend and agree that the confidential information shared between each other will remain confidential as to third parties so as to maintain the attorney-client privilege held by the Chamber and the party. This is precisely what happened with Lyft.

26.     Separately, the Chamber's employees are required to give confidential treatment to confidential information provided to the Chamber, including but not limited to, non-public information provided to the Chamber by its members. Indeed, the Chamber has a written policy that requires employees to observe the confidentiality of information acquired in carrying out their duties and responsibilities, unless disclosure is approved by the Chamber or legally mandated. Employees are required to review this policy annually, and to certify that they read, understood, and will follow the policy. Defendant Postman annually certified compliance with the Chamber's policy.

27.     Defendant Postman was an attorney at the Chamber Litigation Center from April 2014 until June 8, 2018. In that time, he was promoted from Senior Counsel to Associate Chief Counsel, to Deputy Chief Counsel, and then again to Chief Appellate Counsel. His work focused on class action, arbitration, and wage-and-hour law. Defendant Postman routinely represented the Chamber in affirmative litigation and in filing amicus briefs.

28.     During his tenure at the Chamber Litigation Center, Defendant Postman played a leading role for the Chamber on independent-contractor misclassification lawsuits, federal and state (particularly California) wage-and-hour litigation, consumer protection cases (including under California law), and on class action and arbitration issues. In that capacity, he worked

directly with Chamber members on independent-contractor classification litigation matters.

29.     Non-party Steven Lehotsky has worked at the Chamber Litigation Center as an attorney since April 2013.  He has served as Senior Vice President and Chief Counsel for the Chamber Litigation Center since January 1, 2018, and was previously Vice President and Chief Counsel for Regulatory Litigation from 2015-2017 and Deputy Chief Counsel for Litigation from 2013-2015.  During his time at the Chamber Litigation Center, Lehotsky worked on every issue that the Chamber has litigated in the courts and has personal knowledge of all of the Chamber's legal work, operations, and staff from April 2013 to the present.  Lehotsky worked closely with Defendant Postman at the Chamber Litigation Center, including on matters pertaining to Lyft.

30.     As detailed below, Lehotsky and Defendant Postman received privileged and confidential information, including core attorney work-product, from senior members of Lyft's in-house legal team regarding driver classification, Lyft's business operations and other issues. This occurred in emails, calls, and meetings over the course of Lyft's and the Chamber's more than two-and-a-half year long common-interest relationship, including regarding several affirmative litigations that the Chamber pursued related to driver-sclassification issues.

31.     At all times, Defendant Postman knew that information learned from a member of the Chamber pursuant to a common-interest agreement is not to be shared with parties outside the common interest.  At all times, Defendant Postman also knew that Chamber policy also required confidential treatment be accorded to all non-public information provided by a Chamber member. Indeed, Defendant Postman annually certified that he had reviewed and understood this policy.

**B.     Defendant Postman acquired privileged and confidential information about Lyft in the *City of Seattle I* litigation through a common-interest agreement.**

32.     From December 2015 through August 2016, the Chamber (including Defendant Postman)—acting in coordination and collaboration with Lyft—litigated an affirmative case against the City of Seattle's "Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers" ("Ordinance").  This first lawsuit against the City of Seattle is referred to in this complaint as "*City of Seattle I*."

33.     The Ordinance, which was enacted as Section 6.310.110 of the Seattle Municipal

1303840

Code on January 22, 2016, established a collective bargaining scheme through which independent contractor, "for-hire" drivers (including drivers operating on the Lyft Platform) could collectively negotiate the terms of their contractual relationships with "driver coordinators." The Ordinance allowed for a for-hire driver representative to be elected by less than a majority vote of all drivers using a particular driver coordinator, and then locked all other for-hire drivers using the same coordinator into the terms and conditions negotiated by the particular driver coordinator.

34.     In late 2015, as it became apparent that the Ordinance was going to become law, the Chamber, including Defendant Postman, began preparing a lawsuit challenging the legality of the Ordinance to vindicate the interests of Lyft and several other members of the Chamber, as well as those of the business community.

35.     Defendant Postman and Mr. Lehotsky were the two attorneys at the Chamber who were responsible for and most directly involved in the Chamber's challenge to the Ordinance.

36.     The Chamber (including Defendant Postman) identified Lyft's classification of drivers on the Lyft Platform as independent contractors as an important issue to *City of Seattle I* because the Ordinance applied only to drivers classified as independent contractors.

37.     Coordination between the Chamber and Lyft began in December 2015, when the Chamber asked Lyft for its assistance with the *City of Seattle I* litigation.

38.     The Chamber, on the one hand, and Lyft, on the other, shared several common interests in connection with the potential *City of Seattle I* litigation, including interests in maintaining the ability of drivers and companies to contract on a for-hire, independent-contractor basis and in preventing state and municipal regulation of independent-contractor relationships.

39.     From the outset, the Chamber (through Postman and Lehotsky) and Lyft (through its in-house counsel) agreed to share privileged and confidential information to further their common legal interests and entered into a common interest agreement to maintain the privileged and confidential nature of that information. To that effect, beginning in January 2016, Defendant Postman and Mr. Lehotsky sent and received communications from in-house counsel at Lyft marked as "COMMON INTEREST PRIVILEGE," or similar designations such as "JOINT DEFENSE PRIVILEGE," "ATTORNEY WORK PRODUCT," or "PRIVILEGED AND

CONFIDENTIAL."

40.     In the ensuing weeks, members of Lyft's in-house legal team participated in numerous phone calls and meetings and exchanged numerous emails with Defendant Postman and Mr. Lehotsky at the Chamber and members of the Chamber's outside counsel at the law firm Jones Day.  In such communications Lyft provided the Chamber with information to assist its legal challenge to the Ordinance, including advice on legal strategy, information about Lyft's business operations (including confidential aspects of Lyft's business operations), and revisions to draft Chamber pleadings.

41.     Lyft also had privileged and confidential discussions with the Chamber about its associational standing to pursue claims against the City of Seattle.  To show associational standing, an organization is required to show that at least one of its members has suffered a ripe, cognizable injury-in-fact.  For that reason, before filing a complaint, Lyft's in-house counsel communicated privileged and confidential information to the Chamber, including Defendant Postman, about how the Ordinance would impact Lyft's business operations and its legal strategies in response.

42.     The privileged and confidential information that Lyft's in-house counsel provided to the Chamber (including Defendant Postman) was not confined to information about Seattle operations but also included information about how similar ordinance would impact Lyft in other jurisdictions like California and Massachusetts, which were considering similar unionization efforts.

43.     Both Lyft and the Chamber (including Defendant Postman) understood that all these communications were confidential, such that information could not be used or disclosed, and remained privileged based on their common-interest agreement in *City of Seattle I*, Lyft's association with the Chamber, and the relationship of trust and confidence existing among them.

44.     On March 3, 2016, the Chamber filed its complaint against the City of Seattle, which was captioned *Chamber of Commerce v. City of Seattle*, No. 2:16-cv-00322 (W.D. Wash. 2016).  The complaint sought a declaratory judgment that the Ordinance violates and is preempted by the Sherman Act and is preempted by the National Labor Relations Act (in addition

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES
Case No. 3:18-cv-6978

1303840

to several Washington state laws), and an injunction preventing the City of Seattle from enforcing the Ordinance. The Chamber's complaint references Lyft and its business model several times.

45.     The Chamber's lawsuit alleged that the Sherman Act preempted the Ordinance because drivers on the Lyft Platform were independent contractors, not employees, and thus were independent economic actors who could not collude to set prices through collective bargaining. Because the Ordinance permitted drivers to form a collective organization to collude in negotiating the price of their services vis-à-vis Lyft and the terms and conditions of their services, the Chamber alleged that the Ordinance was unlawful under federal antitrust law. In other words, if drivers on the Lyft Platform were properly classified as employees, and not as independent contractors, then the Chamber's antitrust claims would not apply to the Ordinance. For that reason, Lyft's in-house legal team provided to Defendant Postman confidential business information about Lyft's classification of drivers on the Lyft Platform as independent contractors and its legal reasoning related to such classification practices.

46.     The Chamber next alleged that the National Labor Relations Act ("NLRA") preempted the Ordinance because City of Seattle was subjecting independent contractor drivers to collective bargaining rules, a zone of activity that the NLRA expressly left unregulated by the National Labor Relations Board. This is known as "*Machinists* preemption," after the case *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) ("*Machinists*"), and would not apply if Lyft drivers were properly classified as employees. In other words, if drivers on the Lyft Platform were properly classified as employees, and not as independent contractors, then the Chamber's *Machinists* preemption claim would not apply to the Ordinance. For that reason, Lyft's in-house legal team provided to Defendant Postman confidential business information about Lyft's classification of drivers on the Lyft Platform as independent contractors and its legal reasoning related to such classification practices.

47.     Similarly, the Chamber alleged that the NLRA preempted the Ordinance under a related doctrine set forth in *Garmon San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), known as "*Garmon* preemption." It argued that the Ordinance improperly required

the City of Seattle to determine whether drivers for on-demand economy companies like Lyft were employees under the NLRA who are thus exempt from the Ordinance, or independent contractors whom the Ordinance regulated.  The Chamber argued that under *Garmon* this classification decision is assigned to the exclusive jurisdiction of the National Labor Relations Board ("NLRB").  For that reason, Lyft's in-house legal team provided to the Chamber (including Defendant Postman) confidential information about NLRB proceedings on such issues, including confidential business information about Lyft's classification of drivers on the Lyft Platform as independent contractors and its legal reasoning related to such classification practices.

48.     On March 28, 2016, the City of Seattle moved to dismiss the Chamber's complaint in the *City of Seattle I* litigation.  The City of Seattle contended that the dispute was not yet ripe and, relatedly, that the Chamber did not have associational standing because its members had not shown a cognizable injury-in-fact.  The City of Seattle argued that the Chamber's allegation that "some of its members" would "incur additional costs of doing business" was speculative, in part because the Chamber had refused, on confidentiality grounds, to identify which of its members would be injured by the Ordinance.  The City of Seattle similarly argued that the Chamber's allegations that "some of its members" would be injured by the Ordinance's requirement and that "some of its members" would amend their contracts with drivers in response to the Ordinance were similarly speculative.  The City of Seattle's attack on the Chamber's associational standing therefore required it to reach out to the members whose interests it sought to vindicate in *City of Seattle I*, including Lyft, to establish their injuries.

49.     The City of Seattle also argued that the Chamber's claim that the Ordinance was subject to *Garmon* preemption was not yet ripe.  Specifically, the City of Seattle argued that the Chamber had failed to put forth evidence that drivers on the Lyft Platform were employees such that they would be subject to NLRB jurisdiction.  This was necessary, according to the City of Seattle, because, without such evidence there was no credible claim of *Garmon* preemption, as set forth in *International Longshoremen's Association, AFL-CIO v. Davis*, 476 U.S. 380, 395 (1986).

50.     In response to the City of Seattle's motion to dismiss, Lyft's in-house counsel worked actively with the Chamber (including Defendant Postman) and its outside counsel at

Jones Day to respond to the City of Seattle's motion.  Their communications discussed potential legal arguments, legal strategies on issues such as injury-in-fact and ripeness issues and the *Machinists* and *Garmon* preemptions, facts regarding the Ordinance's  harm to Lyft, Lyft's participation in the lawsuit, and Lyft's financial contributions to the Chamber's litigation efforts. At all times, Lyft and the Chamber (including Defendant Postman), understood that these communications were privileged and confidential.

51.     On May 9, 2016, the Chamber filed its response to the City of Seattle's motion to dismiss.  The Chamber contended that certain of its members were facing "present or imminent injuries" on account of the Ordinance, but did not publicly elaborate on those specific claims because of the confidential information involved.

52.     On August 9, 2016, the district court dismissed the *City of Seattle I* lawsuit on standing grounds.  The court held that the individual members represented by the Chamber had failed to show an actual injury-in-fact, because no putative for-hire driver representative had commenced the statutory process for collectively bargaining with any of the Chamber's members.

**C.     Defendant Postman acquired confidential information from Lyft's in-house counsel about its classification practices during a common-interest privileged meeting in January 2017 in San Francisco in anticipation of *City of Seattle II*.**

53.     On December 29, 2016, the City of Seattle promulgated a set of regulations that implemented the Ordinance.  January 17, 2017 was designated as the Ordinance's effective date.

54.     On January 19, 2017, Defendant Postman met with Lyft's in-house counsel at its headquarters in San Francisco to discuss, among other things, whether, once the Ordinance took effect, Lyft would be willing to participate in a second lawsuit in order to resolve the standing issues that the Chamber had faced in *City of Seattle I*.  This second lawsuit against the City of Seattle is referred to in this complaint as "*City of Seattle II*."

55.     Before their meeting on January 19, 2017, Defendant Postman signed a non-disclosure agreement at Lyft that prevented him from using or disclosing information that he learned in connection with the visit for any authorized reason or purpose.  Defendant Postman read and signed the non-disclosure agreement before the January 19, 2017 meeting began.

56.     One topic of Defendant Postman's meeting with Lyft's in-house counsel was to

acquire confidential information about how Lyft's business operations would be affected by the Ordinance, given that *City of Seattle I* was dismissed for failing to show injury-in-fact.

57.     During the January 19, 2017 meeting, senior members of Lyft's in-house legal team—after understanding and re-confirming that their conversation with Defendant Postman was confidential and privileged under their common-interest agreement with the Chamber and the non-disclosure agreement that Defendant Postman had executed before their meeting—provided privileged and confidential information about Lyft's business operations and legal strategy, including information relating to Lyft's driver-classification practices under California law.

58.     Defendant Postman also used the January 19, 2017 meeting as an opportunity to have a broader conversation with Lyft's in-house lawyers about legal issues that concern Lyft and its business operations.  Lyft provided such privileged and confidential information to Postman during this meeting, including on areas of legal risk.

59.     Again, at all times during this meeting, Lyft understood that its communications with Defendant Postman, as an attorney for the Chamber, which represented the Chamber and its members in the *City of Seattle I* and the prospective *City of Seattle II* litigation, were privileged and confidential under their common-interest agreement and their associational relationship.

**D.     Lyft's in-house legal team solicited the Chamber's legal assistance from Defendant Postman.**

60.      Around the same time, Lyft's in-house counsel also asked Defendant Postman whether the Chamber would be interested in filing an amicus brief in support of Lyft's position on appeal in another lawsuit, captioned *Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284 (D. Mass. 2016).

61.     Lyft sought the Chamber's assistance in supporting the court's ruling that the arbitration provision in Lyft's Terms of Service is enforceable.  Lyft understood that this communication with Defendant Postman soliciting legal assistance was common-interest privileged because of the ongoing, confidential relationship between Lyft and the Chamber.

62.     At no point in time did anyone at Lyft or the Chamber ever expect or intend that these conversations would remain anything other than privileged and confidential.

**E.      Defendant Postman acquired further confidential information from Lyft's in-house counsel about its business and legal strategy during *City of Seattle II*.**

63.      On February 22, 2017, the International Brotherhood of Teamsters Local 117 applied to become a qualified representative of for-hire drivers under the Ordinance, and the City of Seattle approved the request a week later.  On March 7, 2017, Teamsters Local 117 gave notice to Lyft (and other Chamber members Uber Technologies, Inc. and Eastside for Hire) that the union would seek to represent drivers contracting with those companies under the Ordinance.

64.      With the dispute between the City of Seattle and the Chamber's members now ripe, the Chamber and Lyft began readying their second lawsuit challenging the Ordinance.

65.      On February 27, 2017, the Chamber circulated a draft complaint and motion for a preliminary injunction to Lyft's in-house legal team and solicited substantive legal feedback.  On March 6, 2017, the Chamber requested that Lyft provide a declaration in support of its motion for a preliminary injunction, stating that the Chamber wanted to move quickly and raising the prospect of Lyft making a contribution to the litigation budget for *City of Seattle II*.

66.      In the following days, Lyft provided substantive legal feedback on the complaint and the motion for a preliminary injunction, provided a declaration that supported the Chamber's legal position, and participated on several telephone calls to discuss the Chamber's next steps.

67.      On March 9, 2017, the Chamber filed its complaint and a motion for a temporary restraining order (supported by a declaration from Lyft) in *Chamber of Commerce v. City of Seattle*, No. 2:17-cv-00370 (W.D. Wash.).  The complaint identified that the Chamber was bringing the action to vindicate the interests of Lyft and several other of its members, including Uber, as well as those of the business community.

68.      The *City of Seattle II* complaint sought to cure the standing issues that defeated the *City of Seattle I* action by alleging that the Ordinance would injure Lyft by requiring it to publicly disclose its drivers list, even though it was "confidential, proprietary, trade secret information[.]" It further alleged that Lyft had "created an innovative business model that depends on partnering with independent contractors" and that "[t]he Ordinance essentially requires driver coordinators to treat independent contractors as employees—a change so disruptive that it could cause these

companies to become unprofitable in Seattle." All of these allegations were the public byproduct of confidential, privileged communications with Lyft that were left out of the complaint entirely.

69.     The *City of Seattle II* complaint also argued that the Ordinance was subject to preemption under the Sherman Act and *Machinists'* and *Garmon* preemption under the NLRA, as in *City of Seattle I*.

70.     On March 10, 2017, the Court set a March 30, 2017 hearing on the Chamber's motion for a temporary restraining order and/or preliminary injunction.

71.     With the *City of Seattle II* litigation ramping up, and with Lyft positioned to take a public role in the case, Lyft sought to confirm again its understanding that its communications with the Chamber (including Defendant Postman) related to the litigation were privileged. During a phone call on or about March 14, 2017 on which Defendant Postman and Mr. Lehotsky participated, Defendant Postman personally confirmed that the Chamber shared a common interest with their members in litigation matters that they pursue together and that the Chamber's communications with their members and shared attorney work product are protected by the common-interest privilege. At this time, Defendant Postman again requested that Lyft contribute to its litigation costs.

72.     On March 21, 2017, the City of Seattle again moved to dismiss the complaint. The City again argued that the Chamber had failed to show associational standing and that its claims were not yet ripe.

73.     On April 10, 2017, the Chamber filed its response to the City of Seattle's motion to dismiss. The Chamber, in accord with Lyft's wishes to maintain the confidentiality of the information that Lyft had shared with the Chamber, including Defendant Postman, about its "market share, operational structure, [and] financial performance," disputed the City of Seattle's claim that Lyft need to produce evidence in support of its claims.

74.     On April 19, 2017, the Chamber submitted a written request for litigation funding to Lyft that Defendant Postman marked on each page as "PRIVILEGED & CONFIDENTIAL," "ATTORNEY-WORK PRODUCT," and "COMMON-INTEREST PRIVILGED." The funding request included detailed description of the Chamber's litigation plan. In May 2017, Lyft agreed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES
Case No. 3:18-cv-6978
1303840

to (and did) contribute funds to the Chamber to pursue its legal challenge to the Ordinance.

75.     On August 1, 2017, the district court in *City of Seattle II* granted the City's motion to dismiss and entered judgment in favor of the City of Seattle shortly thereafter.

76.     On August 9, 2017, the Chamber filed a notice of appeal and briefed the appeal from August 11, 2017, through September 8, 2017.  The Chamber's opening appellate brief, which was written in part by Defendant Postman, addressed the precise factual and legal issues that Defendant Postman and Defendant Keller Lenkner LLC now raise in their arbitration demands.  The Chamber argued that, "Uber and Lyft do not transport passengers from one place to another and therefore are not transportation services; they instead provide referral services that connect for-hire drivers with passengers, and the drivers then provide the transportation services," that "Seattle's Ordinance not only could force Uber and Lyft to abandon their Seattle operations but also place at risk the independent-contractor model in a host of business enterprises, including the burgeoning market of platform services that use smartphones to instantly connect buyers and sellers," and that, "The drivers who use the Uber and Lyft apps are independent contractors.  Uber and Lyft do not employ these drivers and do not own or operate the drivers' vehicles."   These claims were the public byproduct of Postman's and the Chamber's privileged and confidential discussions with Lyft.

77.     On February 5, 2018, the Ninth Circuit heard oral argument and, on May 11, 2018, reversed the district court in part, finding that the Ordinance violated and is preempted by the Sherman Antitrust Act.  The City of Seattle moved for rehearing *en banc* on June 25, 2018, which the Ninth Circuit denied on September 14, 2018.  The Ordinance is now permanently enjoined.

**F.     In January 2018, Lyft's in-house counsel and Defendant Postman discussed Lyft's strategy regarding *Dynamex Operations West v. Superior Court*, the California Supreme Court's recent case on employee classification.**

78.     On December 28, 2017, the California Supreme Court requested supplemental briefing in *Dynamex v. Operations West v. Superior Court*, 4 Cal. 5th 903 (2018), a case addressing certain employee classification issues under California law.  It resolved "what standard applies, under California law, in determining whether workers should be classified as employees or as independent contractors for purposes of California wage orders."

79.     Whether drivers on the Lyft Platform are properly classified as independent contractors under *Dynamex* and California's wage orders is the precise legal issue in the mass demands for arbitration that Defendants have now filed against Lyft in California and Massachusetts.  There is also substantial overlap in the classification issues raised by the *City of Seattle I* and the *City of Seattle II* litigation and the classification issues raised by *Dynamex*.

80.     The Chamber had previously submitted amicus briefs in *Dynamex* in support of the petitioner-business strongly defending the importance of independent contractors in a functioning business environment and to California's economic prosperity.  For that reason, the Chamber argued that California's common law test for determining whether a worker should be classified as an independent contractor or an employee should largely remain in force.

81.     The California Supreme Court's December 28, 2017 request for supplemental briefing sought the parties' positions on whether the court could adopt New Jersey's "ABC test" for classifying workers.

82.     After this request for supplemental briefing on the ABC test was handed down, Lyft's in-house legal team and Defendant Postman discussed in privileged and confidential talks the potential impact of the *Dynamex* decision on Lyft.

G.     **Lyft's communications to the Chamber and Defendant Postman, about the *City of Seattle I*, *City of Seattle II*, *Bekele*, and the supplemental briefing in *Dynamex* were confidential and common-interest privileged.**

83.     Throughout the *City of Seattle I* and *City of Seattle II* litigation, both in the district court and before the Ninth Circuit, Lyft's in-house legal team participated in meetings, phone calls, and email correspondence with the Chamber (including Defendant Postman) to assist in prosecuting the lawsuit under a common-interest agreement.  In these exchanges, Lyft's in-house legal team provided legal analysis and non-public, confidential business information to the Chamber to develop its ripeness, standing, and preemption arguments under the Sherman Act and the NLRA, involving privileged discussions about Lyft's classification practices, areas of potential exposure, and legal strategy.

84.     The same is true with respect to Lyft's communications with the Chamber (including Defendant Postman) about the enforceability of Lyft's arbitration provision and its

overall arbitration strategy in *Bekele*, as well as the supplemental briefing request on the classification standard in *Dynamex*.

85.     Lyft also candidly disclosed some of its public policy arguments in support of treating drivers using its platform as independent contractors rather than employees, as well as confidential, non-public information regarding the consequences to Lyft's business operations if the independent contractor drivers using its Platform were treated like employees for purposes of collective bargaining.  Some of this information was included in an early draft of Lyft's March 2017 declaration exchanged between Lyft and the Chamber (including Defendant Postman), but Lyft removed the information from the final draft due to confidentiality concerns.

86.     Lyft, which has faced and continues to face numerous lawsuits and arbitrations challenging its classification of drivers operating on the Lyft Platform as independent contractors, would not have shared any information with the Chamber but for Lyft's reliance on a common-interest agreement with the Chamber and Lyft's reasonable expectation that Chamber attorneys, including Defendant Postman—who were pursuing litigation to in part vindicate Lyft's interests—would treat the information as confidential, both before, during, and after the litigation.

87.     Lyft's expectation of privilege and confidentiality between itself and the Chamber (including Defendant Postman) during their relationship is based on the following non-exhaustive list of facts:

- Lyft and the Chamber mutually understood that they shared common legal interests in challenging the Ordinance and that communications in furtherance of those common legal interests would be privileged and confidential;

- Lyft is a member of the Chamber, and the Chamber was acting vindicating Lyft's interests (among others) in challenging the Ordinance and asserting associational standing to challenge the Ordinance based on Lyft's membership in the Chamber, all of which conferred an associational privilege between Lyft and the Chamber;

- Lyft contributed financial support to the Chamber's challenge to the Ordinance during *City of Seattle II*;

- Lyft and the Chamber worked hand-in-hand in developing the Chamber's legal

strategy:  Lyft discussed and disclosed legal strategies and tactics with the
Chamber, provided confidential business information to the Chamber, reviewed
and edited the Chamber's work product, and provided a declaration in support of
the Chamber's application for a temporary restraining order in *City of Seattle II*;

- Lyft's in-house attorneys expressly confirmed their understanding that Lyft and
the Chamber's conversations were privileged and confidential in a phone call on or
about March 15, 2017 with Chamber attorneys, including Defendant Postman,
during which Defendant Postman said that the Chamber shares a common legal
interest with its members when litigating to vindicate their interests, and that
communications with its members in connection with those litigations remain
protected by the attorney-client privilege and work product doctrine;

- This understanding is confirmed by numerous documents and emails exchanged
between Lyft and the Chamber in connection with challenging the Ordinance
bearing the designations "PRIVILEGED & CONFIDENTIAL," "ATTORNEY-
CLIENT PRIVILEGED," "ATTORNEY-WORK PRODUCT," and/or
"COMMON-INTEREST PRIVILEGED."; and,

- The Chamber has a uniform policy of maintaining all non-public information that
a Chamber member provides to it as confidential.

**H.**     **After the California Supreme Court rejected the Chamber's legal position in
*Dynamex*, Defendant Postman joined Defendant Keller Lenkner LLC.**

88.     On April 30, 2018, the California Supreme Court issued its opinion in *Dynamex*.
The court ruled against the petitioner-business and the Chamber's position on classification that it
had taken in its amicus briefs, adopting the Massachusetts statutory version of the ABC test.

89.     Earlier in 2018, Defendant Postman asked a senior member of Lyft's in-house
legal team to participate in the Chamber's Labor & Employment Litigation Advisory Committee.
Defendant Postman told her that membership in the Committee would be an opportunity for Lyft
to become more directly involved in the Chamber's efforts to advocate on labor and employment
issues, specifically including advocacy of independent contractor arrangements such as the

1303840

relationship between Lyft and drivers using its platform.  Another senior member of Lyft's in-house legal team now sits on the Chamber's Liability Reform Litigation Advisory Committee.

90.     In May 2018, Defendant Postman emailed the Chamber's Labor & Employment Litigation Advisory Committee, including the member of Lyft's in-house legal team, regarding a petition for rehearing on the *Dynamex* decision, informing the members of the Committee that the Chamber intended to file an amicus brief supporting the petitioner.  In explaining the Chamber's decision to move forward with the amicus brief, Defendant Postman wrote: "Numerous Chamber members have reached out to share their grave concerns over this decision."  This passage in Defendant Postman's email, on information and belief, refers at least in part to the privileged and confidential communications Lyft shared with him in the previous months regarding the *Dynamex* decision's potential impact on Lyft's business operations.  At end, Defendant Postman solicited "any concerns or additional thoughts regarding" the legal strategy outlined in his email.

91.     On May 29, 2018, the Chamber, along with its outside counsel, submitted a further brief seeking rehearing on the retroactivity of *Dynamex*.

92.     On June 7, 2018, Defendant Postman withdrew as counsel for the Chamber in the *City of Seattle II* action.  The next day, on June 8, 2018, Defendant Postman quit the Chamber.  That same month, Defendant Postman became a partner at Defendant Keller Lenkner LLC.

**I.      On October 26, 2018, Defendants filed numerous arbitration demands against Lyft, despite repeated warnings about their disqualifying conflict of interest.**

93.     In October 2018, Defendant Postman informed Lyft that he intended to serve numerous arbitration demands on behalf of his driver clients against Lyft.

94.     On October 25, 2018, outside counsel for Lyft sent a letter to Keller detailing the basis for Lyft's assertion that Defendants had a conflict that precluded them from representing clients on misclassification issues against Lyft and demanding that they immediately withdraw from any such representation.  Keller responded by email on October 26, 2018, indicating that Defendants refused to withdraw.

95.     On October 26, 2018, Defendants filed numerous arbitration demands alleging that Lyft misclassifies drivers as independent contractors with the American Arbitration Association

on behalf of the drivers on the Lyft Platform they claim to represent.

## CLAIMS FOR RELIEF

### CLAIM ONE

### DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201

### (Against Defendants Warren Postman and Keller Lenkner LLC)

96.     Lyft repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97.     An actual and substantial controversy exists between Lyft and Defendants as to their respective legal rights and duties.  Lyft contends that Defendant Postman has breached and will further breach his duty of confidentiality to Lyft by using and disclosing Lyft's privileged and confidential information against Lyft in numerous arbitrations for his personal profit.

98.     Lyft further contends that Defendant Postman has an actual conflict of interest and that Defendant Keller Lenkner LLC has an imputed conflict of interest.  Under conflict of interest law in California, an attorney must be disqualified if he or she possesses confidential information about a non-client from a prior representation (*e.g.*, from a joint-defense group or common-interest relationship), or if the prior representation is substantially related to a subsequent representation.  Applying this standard, Lyft contends that Defendant Postman has an actual conflict of interest that must also be imputed to Defendant Keller Lenkner LLC, such that Defendants must both be disqualified from representing any person or entity against Lyft with respect to misclassification issues.

99.     This dispute is ripe.  Defendants have filed numerous arbitration demands against Lyft in California and Massachusetts, despite the actual and imputed conflict of interest that has arisen from Postman's confidential relationship with Lyft.  Outside counsel for Lyft placed Defendants on notice of their conflicts of interest, and Defendants denied having a conflict.

100.     A declaration would thus serve a useful purpose in clarifying and settling the legal relations in issue and afford relief from the uncertainty and controversy faced by the parties.

101.     It is in the public interest to issue a declaration stating that Defendants may not use or disclose Lyft's privileged and confidential information, including in an adversarial proceeding

1303840

against Lyft that relates to driver-misclassification issues.  Both the attorney-client privilege and the duty of confidentiality that arises between attorneys involved in common-interest work are fundamental components of the legal system that warrant the protection of the courts.

102.    The value to Lyft of the declaratory judgment sought exceeds $75,000.

## CLAIM TWO

## BREACH OF DUTY OF CONFIDENCE

## (Against Defendants Warren Postman and Keller Lenkner LLC)

103.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.    California law recognizes the tort of breach of confidence.  This tort is based upon the concept of an implied obligation or contract between the parties that confidential information will not be disclosed.  To prevail on a claim for breach of confidence, a plaintiff must demonstrate that: (1) the plaintiff conveyed confidential and novel information to the defendant; (2) the defendant had knowledge that the information was being disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the confidence be maintained; and (4) there was a disclosure or use in violation of the understanding.

105.    Lyft conveyed privileged and confidential information to Defendant Postman pursuant to its common-interest agreement with the Chamber that arose during the pendency of the *City of Seattle I* and *City of Seattle II* litigations.  Lyft gave Defendant Postman information about its business operations and its legal strategies, including but not limited to its driver-classification practices, potential areas of misclassification exposure, and litigation and arbitration strategy.  Indeed, Lyft exchanged confidential emails with Postman and held regular status calls and meetings in furtherance of their common interest over the course of their more than two-year relationship.  Lyft's confidential information remained attorney-client privileged and protected work-product under the common-interest doctrine and the parties' common-interest agreement. The confidential information was necessary for the Chamber's litigation of the City of Seattle cases.

106.    Defendant Postman knew that the information Lyft's in-house legal team shared

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES
Case No. 3:18-cv-6978

1303840

with the Chamber, including himself, was disclosed in confidence.  The Chamber has confirmed that Lyft and the Chamber were parties to a common interest agreement that protected communications between them.  Defendant Postman himself personally confirmed that he was aware of this confidentiality requirement to Lyft on numerous occasions, including on a call with Lyft's in-house counsel that happened on or about March 14, 2017.  He also stamped draft documents and communications that he shared with Lyft "PRIVILEGED & CONFIDENTIAL," "ATTORNEY-CLIENT PRIVILEGED," "ATTORNEY-WORK PRODUCT," and "COMMON-INTEREST PRIVILEGED."  Defendant Postman also signed a non-disclosure agreement with Lyft when he (on behalf of the Chamber) visited its San Francisco headquarters on January 19, 2017, that expressly informed him that any information shared was confidential and could not be disclosed.

107.    Defendant Postman knew that Lyft and the Chamber expected that the parties would maintain the confidentiality of the information that Lyft's in-house counsel shared. Multiple members of Lyft's in-house counsel repeatedly confirmed with Defendant Postman that they expected him to maintain Lyft's non-public information as privileged and confidential, and he did.  Neither Lyft nor the Chamber have since given Postman permission to use or disclose the privileged and confidential information that he learned from Lyft's in-house legal team.

108.    On information and belief, Defendant Postman has improperly disclosed Lyft's privileged and confidential information to his law firm, Defendant Keller Lenkner LLC, and those working concert with them in filing arbitration demands asserting misclassification against Lyft.

109.    The driver-misclassification claims that Defendants have submitted to arbitration against Lyft threaten further substantial injury to Lyft because those proceedings will necessarily require Defendant Postman to use and disclose Lyft's privileged and confidential communications and by incurring fees and costs from the arbitration demands, including filing and attorneys' fees. Indeed, California conflict of interest law presumes that an attorney possessing an actual conflict of interest arising from the acquisition of confidential information from a non-client will use and share that information in a subsequent and substantially-related action against the non-client.

110.    As a result, Lyft has been damaged in an amount exceeding $75,000.

**CLAIM THREE**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**(Against Defendants Warren Postman and Keller Lenkner LLC)**

111.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112.    Defendant Postman and Defendant Keller Lenkner LLC have violated and are violating the unlawful prong of California's unfair competition law, Cal. Bus & Prof. Code § 17200, *et seq.*, by breaching (and conspiring to breach) the duty of confidentiality that Defendant Postman owes to Lyft as a result of their longstanding confidential relationship, the common-interest agreement between Lyft and the Chamber, and the non-disclosure agreement that Defendant Postman signed.  Violations of the common law are actionable under the unfair competition law's unlawful prong.

113.    Defendant Postman and Defendant Keller Lenkner LLC have also violated and are violating the unfair prong of California's unfair competition law, Cal. Bus & Prof. Code § 17200, *et seq.*, by breaching (and conspiring to breach) the duty of confidentiality that Defendant Postman owed to Lyft as a result of their longstanding confidential relationship, the common-interest agreement between Lyft and the Chamber, and the non-disclosure agreement that Defendant Postman signed.  California has a strong public policy in favor of maintaining the attorney-client privilege and the confidentiality of communications between attorneys and those with whom they have entered into confidential relationships, which is statutorily codified in California Evidence Code § 954.  Public policy underlying conflict of interest law in California makes clear that an attorney must be disqualified if he or she possesses confidential information about a non-client from a prior representation (*e.g.*, from a joint-defense group or common-interest relationship) that is substantially related to a subsequent representation.  This is not only for the benefit of the party seeking disqualification, but for the clients that the conflicted attorneys represent.  Those clients have the right to a fair proceeding that is not tainted by prejudice.

114.    Defendant Postman and Defendant Keller Lenkner LLC have also violated and are violated the unfair prong of California's unfair competition law by engaging in immoral,

unethical, oppressive, unscrupulous, and substantially injurious conduct by breaching and conspiring to breach the duty of confidentiality that Defendant Postman owes to Lyft.  Conflict of interest law in California makes clear that an attorney must be disqualified if he or she possesses confidential information about a non-client from a prior representation (*e.g.*, from a joint-defense group or common-interest relationship) that is substantially related to a subsequent representation. Despite Defendants' actual notice of their conflict of interest, they are pursuing misclassification-based claims against Lyft in the mass of arbitrations that they have submitted.  The harms that Defendants conduct has and will cause substantially outweighs any corresponding benefit that it has, which is none, considering that public policy assigns no value to conflicted representations.

115.    Lyft has statutory standing to seek relief under California's unfair competition law because it suffered an economic injury as a result of Defendants' unlawful and unfair conduct. Specifically, Lyft incurred an economic injury when it was forced to retain counsel to defend itself against the conflicted claims that Defendants are now bringing against it.

116.    Lyft seeks injunctive relief enjoining Defendants from engaging in the unlawful and unfair practices described above.

### CLAIM FOUR

### BREACH OF NON-DISCLOSURE AGREEMENT

### (Against Defendant Warren Postman)

117.    Lyft repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

118.    On January 19, 2017, Defendant Postman agreed to and signed a non-disclosure agreement with Lyft when he personally visited its San Francisco headquarters.  The terms of the non-disclosure agreement stated that any information shared by Lyft with him in connection with Defendant Postman's visit was confidential and could not be used or disclosed for any reason.

119.    The terms of the non-disclosure agreement further stated that, by agreeing to the non-disclosure agreement, Defendant Postman acknowledged and agreed that any breach of the agreement would cause irreparable harm to Lyft for which damages are not an adequate remedy, therefore entitling Lyft to equitable relief in addition to other available remedies.

120.    The terms of the non-disclosure agreement also provide that the prevailing party in any dispute or legal action regarding the subject matter of the agreement is entitled to recover attorneys' fees and costs.

121.    Defendant Postman had a duty under the non-disclosure agreement to maintain the confidential nature of the information that Lyft shared with him in connection with his January 19, 2017 meeting at Lyft's headquarters in San Francisco.

122.    Defendant Postman, on information and belief, breached his duty of confidentiality to Lyft by disclosing the confidential information that Lyft confided in him in connection with his January 19, 2017 visit to Defendant Keller Lenkner LLC and others acting in concert with them.

123.    Through that breach, Defendant Postman has caused irreparable damage to Lyft by disclosing its confidential information to Defendant Keller Lenkner LLC by filing a mass of arbitration demands that necessarily rely on that the use and disclosure of that information.

## CIVIL CONSPIRACY/AIDING AND ABETTING ALLEGATIONS

### (Regarding Defendant Keller Lenkner LLC)

124.    Lyft repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

125.    Defendant Keller Lenkner LLC, upon information and belief, agreed to acquire, use, and disclose the privileged and confidential information that Defendant Postman acquired through his work with Lyft at the Chamber, for its personal gain in litigation against Lyft.

126.    Defendant Postman and Defendant Keller Lenkner LLC both knew and intended that Defendant Postman's disclosure and use of Lyft's privileged and confidential information was a breach of his duty of confidentiality to Lyft, his professional duties as an attorney, and the common-interest agreement between Lyft and the Chamber, and they intended that these breaches be committed by Defendant Postman for their personal gain.

127.    Because Defendant Keller Lenkner LLC conspired with Defendant Postman to tortiously breach his duties to Lyft, and has aided and abetted those breaches at least since outside counsel for Lyft put it on notice of its imputed conflict of interest, Defendant Keller Lenkner LLC is also liable for Defendant Postman's tortious conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court grant the following relief:

1.      Preliminary and permanent injunctive relief:

      a.    Enjoining Defendant Warren Postman and Defendant Keller Lenkner LLC from representing any person in any action alleging that Lyft misclassifies drivers operating on the Lyft Platform or in any action that otherwise relates to the privileged and confidential information transmitted to Defendant Warren Postman by Lyft and its in-house legal team as described throughout the complaint;

2.      A declaration that:

      a.    Defendant Warren Postman and Lyft entered into a common-interest agreement in connection with the Chamber's litigation on Lyft's behalf;

      b.    Defendant Warren Postman has a duty of confidentiality to Lyft regarding their common-interest agreement and any confidential information communicated to him thereto;

      c.    Defendants have a disqualifying conflict of interest in any proceeding brought in California or in any other jurisdiction;

3.      Compensatory damages in an amount to be determined at trial;

4.      Punitive damages;

5.      An award to Plaintiff of reasonable costs and attorney's fees; and,

6.      Such other and further relief that this Court may deem fit and proper.

Lyft demands a jury trial on all issues so triable.

Dated:  November 16, 2018                      KEKER, VAN NEST & PETERS LLP

                                     By:   /s/ Rachael E. Meny
                                           RACHAEL E. MENY
                                         R. JAMES SLAUGHTER
                                         IAN A. KANIG

                                         Attorneys for Plaintiff
                                         LYFT, INC.